# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT) PENSION FUND, and JACK STEWART, trustee, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 06 C 5987 |
| v. | ) ) ) | Judge Filip Magistrate Judge Brown |
| LOYAL CASKET COMPANY, an Illinois corporation, | ) ) ) | |
| Defendant. | ) | |

## MOTION FOR DEFAULT AND DEFAULT JUDGMENT

Plaintiffs move the Court under Fed.R.Civ.P. ("Rule") 55(b) for an order directing the Clerk of the Court to enter a default and default judgment against Defendant Loyal Casket Company. Plaintiffs state in support:

1.     On November 2, 2006, Plaintiffs filed this ERISA action to collect withdrawal liability from Defendant.

2.     Defendant was properly served on November 7, 2006 (R. 8), but has failed to answer or otherwise plead within the time allowed by Rules 12 and therefore is in default.

3.     The total amount Defendant owes Plaintiffs is $188,124.72. This amount consists of: (a) $149,643.50 in withdrawal liability (Ex. 1 – Declaration of Phyllis Gabriel at ¶¶ 15-17 and Ex. A thereto); (b) $5,566.02 in prejudgment interest through December

12, 2006 (*Id.* at ¶ 18 and Ex. C thereto); (c) $29,928.70 in statutory liquidated damages, as allowed under ERISA § 502(g)(2)(C)(ii) (*Id.* at ¶¶ 19-21 and Ex. B thereto); (d) $420.00 in costs (Ex. 2 – Declaration of William W. Leathem at ¶ 12); and (e) $2,566.50 in attorneys' fees for prosecuting this suit against Defendant. (*Id.* at ¶¶ 10-11.)

      **WHEREFORE**, Plaintiffs respectfully request:

(A)    That Defendant Loyal Casket Company be adjudged to be in default.

(B)    That a default judgment be entered against Defendant in conformity with the relief requested in Plaintiffs' Complaint and as supported by the attached declarations, in the total amount of $188,124.72.

Respectfully submitted,

/s/ William W. Leathem
William W. Leathem
Attorney for Plaintiffs
Jacobs Burns Orlove Stanton & Hernandez
122 S. Michigan Avenue, Suite 1720
Chicago, IL 60603
(312) 372-1646

## CERTIFICATE OF SERVICE

I certify that on December 4, 2006, I electronically filed the foregoing MOTION FOR DEFAULT AND DEFAULT JUDGMENT with the Clerk of the court using the CM/ECF system; however, there are no attorneys of record who will be sent electronic notification of such filing.

I certify that on December 4, 2006, I caused a copy of the attached MOTION FOR DEFAULT AND DEFAULT JUDGMENT to be served via first class mail, postage prepaid, to:

> Loyal Casket Company
> c/o Michael Schneiderman, Registered Agent
> 6035 N. Northwest Highway, # 301
> Chicago, IL 60631
>
> Loyal Casket Company
> c/o Anthony Kolaski, President
> 4828 N. Greenwood
> Norridge, IL 60656

/s/ William W. Leathem
William W. Leathem

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT) PENSION FUND, and JACK STEWART, trustee, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 06 C 5987 |
| v. | ) ) ) | Judge Filip Magistrate Judge Brown |
| LOYAL CASKET COMPANY, an Illinois corporation, | ) ) ) | |
| Defendant. | ) | |

**DECLARATION OF PHYLLIS GABRIEL**

I, Phyllis Gabriel, pursuant to 28 U.S.C. § 1746 declare under penalty of perjury that the following is true and correct.

1.      I have been the Fund Office Supervisor of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund since April 1994. From October 13, 1986 through March 1994, I was the Supervisor for the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Health and Welfare Fund (f/k/a Health Maintenance Program Fund) and the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Severance Fund, both of which are separate entities but affiliated with the Fund. I have personal knowledge of the facts set forth in this declaration and I am competent to testify as a witness.

2.      The Fund is a multi-employer employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et seq.* The Fund provides pension and disability benefits to eligible participants and their beneficiaries.

Gabriel Decl (Accel Def WL) (Loyal).doc

3. I am familiar with the operation and administration of the Fund and I regularly attend the meetings of the Fund's Trustees.

4. My duties as Fund Office Supervisor include but are not limited to: overseeing the billing and collection of employer contributions owed to the various Funds pursuant to collective bargaining agreements ("CBAs") between various local unions and employers; processing employers' reported employee work history on monthly remittance/contribution reports and the application of the corresponding payments of contributions to the Funds; determining whether employers have effected partial and/or complete withdrawals from the Fund under ERISA; calculating the withdrawal liability of withdrawn employers; issuing notices and demands for payment of withdrawal liability to withdrawn employers and preparing payment schedules; determining whether "trades or businesses" are under "common control", as defined in ERISA, for purposes of assessing withdrawal liability against "controlled groups"; and investigating and advising the Fund's Trustees on issues arising as to an employer's withdrawal liability.

5. The Fund is authorized to receive and accept contributions from participating employers pursuant to CBAs, the Fund's Trust Agreements, and federal labor law.

6. The Fund operates on the basis of an employer self-reporting system that requires participating employers to identify those employees for whom contributions are owed, to identify (depending on the particular contract's language) the hours, days, or weeks worked by covered employees, and to pay the corresponding contributions.

7. Under my dominion and control are files for all employers who have been obligated to contribute to and who have contributed to the Fund, and for all employers that have withdrawn from the Fund, including one for Loyal Casket Company ("Loyal").

Gabriel Decl (Accel Def WL) (Loyal).doc

2

8.     Loyal was subject to collective bargaining agreements ("CBAs") with the Chicago Truck Drivers, Helpers and Warehouse Workers' Union (Independent) ("Union"), under which Loyal was required to contribute to the Fund on behalf of employees who performed work covered by the CBAs.

9.     Loyal, and thus all trades or businesses under common control with them (the "Loyal Controlled Group"), constitute a single employer within the meaning of ERISA § 4001(b)(1), 29 U.S.C. § 1301(b)(1), and the regulations promulgated thereunder.

10.     The Loyal Controlled Group is the "employer" for purposes of the determination and assessment of withdrawal liability under Title IV of ERISA.

11.     The Fund determined that on or about May 1, 2006, Loyal permanently ceased to have an obligation to contribute to the Fund or permanently ceased all covered operations, thereby effecting a "complete withdrawal," as defined in ERISA § 4203, 29 U.S.C. § 1383, from the Fund.

12.     As a result of this complete withdrawal, Loyal and all individuals and entities constituting the Loyal Controlled Group, incurred withdrawal liability to the Fund, which the Fund initially estimated to be in the amount of $163,144.40, as determined under ERISA § 4201(b), 29 U.S.C. § 1381(b).

13.     On or about June 16, 2006, Loyal, through its registered agent, and thus the Loyal Controlled Group, received a notice and demand for payment of withdrawal liability issued by the Fund in accordance with ERISA §§ 4202(2) and 4219(b)(1), 29 U.S.C. §§ 1382(2) and 1399(b)(1). The notice and demand notified the employer that it was required to discharge its withdrawal liability in either a lump sum or in eighty (80) quarterly installments of $2,808.00,

Gabriel Decl (Accel Def WL) (Loyal).doc

3

and further advised that the first installment was due July 1, 2006. *See* ERISA § 4219(c)(2), 29 U.S.C. § 1399(c)(2).

14.     On or about September 1, 2006, Loyal, through its registered agent, and thus the Loyal Controlled Group, received a notice from the Fund, pursuant to ERISA § 4219(c)(5)(A), 29 U.S.C. § 1399(c)(5)(A), advising that its withdrawal liability payments were past due, and which forewarned Loyal and the Loyal Controlled Group of the consequences of its failure to pay such liability.

15.     On or about October 13, 2006, Loyal, through its registered agent, and thus the Loyal Controlled Group, received a notice from the Fund advising that the Fund had recalculated the amount of the withdrawal liability assessment to be $149,643.50, the payment schedule remained unchanged, and the first two payments due on the schedule were past due, and restating the consequences of the failure to pay such liability. Ex. A hereto is a true, correct, and complete copy of the Fund's withdrawal liability assessment calculation concerning Loyal that I performed.

16.     The Loyal Controlled Group, including Loyal, did not timely initiate arbitration pursuant to ERISA § 4221(a)(1), 29 U.S.C. § 1401(a)(1). Consequently, the amounts demanded by the Fund are due and owing pursuant to ERISA § 4221(b)(1), 29 U.S.C. § 1401(b)(1).

17.     The Loyal Controlled Group, including Loyal, failed to make the required withdrawal liability payments to the Fund, is in default within the meaning of ERISA § 4219(c)(5), 29 U.S.C. § 1399(c)(5), and thus entire amount of withdrawal liability is accelerated and immediately due and owing. *Id.*

18.     Under ERISA § 502(g)(2)(B), 29 U.S.C. § 1132(g)(2)(B), prejudgment interest is

Gabriel Decl (Accel Def WL) (Loyal).doc

4

determined using the rate under the plan. The Fund's plan provides for interest on defaulted withdrawal liability at the "prime rate as reported daily by the Wall Street Journal for the fifteenth (15th) day of the month for which interest is charged." (*See* Ex. B – Amended Rules and Regulations Pertaining to Employer Withdrawal Liability at p. 19, § 5(d)(IV)(C).) Further, ERISA § 4219(c)(5), 28 U.S.C. § 1399(c)(5), provides for "accrued interest on the total outstanding [withdrawal liability] from the due date of the first payment which was not timely made." Attached as Ex. C is the Fund's interest calculation that was performed under my immediate supervision and which I reviewed. Using the interest rate provided under the plan and applying the appropriate rates, interest from the date of the employer's first missed payment, July 1, 2006, through December 12, 2006 totals $5,566.02.

19.     ERISA § 502(g)(2)(C), 29 U.S.C. § 1132(g)(2)(C), provides that the Fund is entitled to the greater of: (i) interest again on the unpaid principal amount, or (ii) liquidated damages under the plan in an amount not exceeding 20%. The Fund's plan provides for liquidated damages in the amount of 20% of the withdrawal liability. (*See* Ex. B - Amended Rules and Regulations Pertaining to Employer Withdrawal Liability at p. 18, § 5(d)(IV)(B).)

20.     Thus, in this case, the liquidated damages as calculated in accordance with the Fund's plan on the withdrawal liability due and owing at the time suit was filed total $29,928.70 ($149,643.50 x 20%).

21.     Because the amount of liquidated damages is greater than interest, the Fund is entitled to statutory liquidated damages in the amount of $29,928.70.

Gabriel Decl (Accel Def WL) (Loyal).doc

5

22.    All members of the Loyal Controlled Group, including Loyal, are jointly and severally liable to the Fund for the withdrawal liability.

Executed on December ⎵, 2006.

_Phyllis Gabriel_
Phyllis Gabriel

# EXHIBIT 1A

*Loyal Casket Co*
*Dow 5/1/06*

## CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT) PENSION FUND - DETERMINATION OF WITHDRAWAL LIABILITY PAYMENT SCHEDULE - COMPLETE WITHDRAWAL

EMPLOYER NAME  *Loyal Casket Co*

Date of Withdrawal  *5-1-06*

Valuation Rate of Interest  *8 %*

I.  Withdrawal Liability (from page B-11 of withdrawal liability worksheet)  $ *149,643.50*

II.  Quarterly Payment Amount

    a.  Determine the 3 consecutive plan years during the 10-year plan period ending <u>before</u> the plan year of withdrawal, in which the number of base units (weeks) are the highest.

        *2003*  *52* weeks

        *2004*  *52* weeks

        *2005*  *52* weeks

    b.  Average units (sum in (a) divided by 3):  *52*

    c.  Highest contribution rate during the 10-year period ending with the plan year of withdrawal: $ *216.00* per week.

    d.  Annual payment: (b) x (c)  $ *11,232.00*

    e.  Quarterly payment: (d) ÷ 4  $ *2,808.00*

III.  Payment Schedule

    a.  Effective amortization factor: (I) ÷ II(d)  *13.32296 1*

    b.  Number of complete years with 4 quarterly payments:  *20*

        *PAYMENTS*

    [Using Table 2, determine the largest N such that the factor in column (2) is *STILL LIMITED* less than III(a)]  *TO 20 YEARS.*

    c.  Factors to compute the outstanding withdrawal liability after N years:

        (i)  compound interest factor for N years: _____
        (From Table 2, factor under column (3) corresponding to the Nth row)

(ii)    payment accumulation factor for N years:
        (factor under column (4))                _____

d.    Outstanding balance after N years:

Withdrawal liability (Item I) multiplied by compound interest for N years (Item III(c)(i)) less annual payments (Item II(d)) multiplied by N years of interest accumulation factor (Item III(c)(ii)).

$$( \underline{\hspace{3cm}} \times \underline{\hspace{3cm}} ) - ( \underline{\hspace{3cm}} \times \underline{\hspace{3cm}} )$$

item I             item III(c)(i)           item II(d)           item III(c)(ii)

$$= \underline{\hspace{4cm}}$$

e.    Quarterly payments in final year.

(Number of quarterly payments in outstanding balance after N years, III(d)).             _____

f.    Amount of final payment:

(Outstanding balance after N years, III(d), less the total amount of quarterly payments determined in III(e)).       _____

g.    Total number of quarterly payments.

4 x _____ (item III(b))  +  _____ (item III(e))      _____

**Chicago Truck Drivers, Helpers and Warehouse**
**Workers Union (Independent) Pension Fund**

## EXHIBIT III

### ACTUARIAL ASSUMPTIONS AND METHODS

**Investment return:**

(a)  To the extent vested benefits are matched by the market value of plan assets: interest assumptions prescribed by the Pension Benefit Guaranty Corporation for terminating plans which are in effect for the applicable withdrawal liability valuation date.

Interest rates as of March 31, 2006

First 20 years        5.70%

After 20 years        4.75%

(b)  To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 8.0%

(c)  The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses -- at PBGC rates -- with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

Effective March 31, 1996, the Trustees had elected to limit the unfunded vested liability for withdrawal liability purposes to be no greater than the vested liability calculated using the same investment return assumption used for funding less the actuarial value of assets. This limit was removed by the Trustees effective March 31, 2004.

Chicago Truck Drivers, Helpers and Warehouse
Workers Union (Independent) Pension Fund

## EXHIBIT III (Continued)

## ACTUARIAL ASSUMPTIONS AND METHODS

**Mortality rates:**  1983 Group Annuity Mortality Table (sex distinct rates)

**Disability mortality rates:**  1983 Railroad Retirement Board Disabled Life Mortality Table

**Retirement age:**  Upon completion of service requirement, the following rates apply:

| Age | Rate |
|-----|------|
| 55 | 15% |
| 56 – 61 | 5% |
| 62 | 15% |
| 63 – 64 | 5% |
| 65 | 100% |

An additional 5% is assumed in each year that a participant has 30 or more years of service and is below age 65.

For inactive vested participants, age 62 with 10 pension benefit credits, otherwise age 65

**Unknown characteristics of employees:**  Same as those exhibited by employees with similar known characteristics. If not specified, participants are assumed to be male.

**Expense load:**  $10,000, plus $200 per participant, plus a percentage (determined by statute) of the excess of the value of plan benefits over $200,000, not applicable to those liabilities determined using the funding interest rate.

**Valuation of assets:**  At market value

**Allocation method:**  Presumptive

**Contribution period for prorating liabilities:**  5 years

*De minimis* **deductible:**  $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000.

**Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund**

LOYAL CASKET COMPANY
DOW May 1, 2006

## APPENDIX B

Calculation of Liability for Complete Withdrawal
For Period from April 1, 2006 through March 31, 2007

This exhibit presents the basis for determining an employer's withdrawal liability. Any employer can estimate its own potential liability for complete withdrawal by entering it's contribution figures on the lines, multiplying each by the corresponding allocation ratio and entering the results under "liability components."

| | ITEMS | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|---|
| | **From Year-end March 31, 1987** | | |
| 1. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 1,132,400 | |
| 2. | Reallocated liability, unamortized balance at March 31, 2006 | 56,700 | |
| 3. | Total: (1) plus (2) | 1,189,100 | |
| 4. | Total plan contributions, five years ended March 31, 1987 | 46,324,327 | |
| 5. | The employer's obligated contributions, five-year period ended March 31, 1987 | _28,132.80_ | |
| 6. | Allocation ratio: (3) divided by (4) | .025669 | |
| 7. | Withdrawal liability component: (5) times (6) | | _722.14_ |

⋇ SEGAL

B-1

**Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund**

| | ITEMS | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|---|
| | **From Year-end March 31, 1988** | | |
| 8. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 980,500 | |
| 9. | Reallocated liability, unamortized balance at March 31, 2006 | 290,800 | |
| 10. | Total: (8) plus (9) | 1,271,300 | |
| 11. | Total plan contributions, five years ended March 31, 1988 | 45,045,581 | |
| 12. | The employer's obligated contributions, five-year period ended March 31, 1988 | 29,206.40 | |
| 13. | Allocation ratio: (10) divided by (11) | .028223 | |
| 14. | Withdrawal liability component: (12) times (13) | | 824.29 |
| | **From Year-end March 31, 1989** | | |
| 15. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 1,067,000 | |
| 16. | Reallocated liability, unamortized balance at March 31, 2006 | 287,800 | |
| 17. | Total: (15) plus (16) | 1,355,600 | |
| 18. | Total plan contributions, five years ended March 31, 1989 | 44,402,033 | |
| 19. | The employer's obligated contributions, five-year period ended March 31, 1989 | 27,393.60 | |
| 20. | Allocation ratio: (17) divided by (18) | .030530 | |
| 21. | Withdrawal liability component: (19) times (20) | | 836.33 |

✳ SEGAL

B-2

**Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund**

| ITEMS | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|
| **From Year-end March 31, 1990** | | |
| 22. Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 406,400 | |
| 23. Reallocated liability, unamortized balance at March 31, 2006 | 212,600 | |
| 24. Total: (22) plus (23) | 619,000 | |
| 25. Total: plan contributions, five years ended March 31, 1990 | 44,075,847 | |
| 26. The employer's obligated contributions, five-year period ended March 31, 1990 | 25,332.60 | |
| 27. Allocation ratio: (24) divided by (25) | .014044 | |
| 28. Withdrawal liability component: (26) times (27) | | 355.77 |
| **From Year-end March 31, 1991** | | |
| 29. Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 1,520,200 | |
| 30. Reallocated liability, unamortized balance at March 31, 2006 | 221,000 | |
| 31. Total: (29) plus (30) | 1,741,200 | |
| 32. Total plan contributions, five years ended March 31, 1991 | 42,863,427 | |
| 33. The employer's obligated contributions, five-year period ended March 31, 1991 | 23,356.60 | |
| 34. Allocation ratio: (31) divided by (32) | .040622 | |
| 35. Withdrawal liability component: (33) times (34) | | 948.72 |

✻ SEGAL

B-3

**Chicago Truck Drivers, Helpers and Warehouse
Workers Union (Independent) Pension Fund**

| | ITEMS | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|---|
| | **From Year-end March 31, 1992** | | |
| 36. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 946,700 | |
| 37. | Reallocated liability, unamortized balance at March 31, 2006 | 649,600 | |
| 38. | Total: (36) plus (37) | 1,596,300 | |
| 39. | Total plan contributions, five years ended March 31, 1992 | 38,406,925 | |
| 40. | The employer's obligated contributions, five-year period ended March 31, 1992 | _20,966.20_ | |
| 41. | Allocation ratio: (38) divided by (39) | .041563 | |
| 42. | Withdrawal liability component: (40) times (41) | | _871.42_ |
| | **From Year-end March 31, 1993** | | |
| 43. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 3,302,000 | |
| 44. | Reallocated liability, unamortized balance at March 31, 2006 | 1,241,100 | |
| 45. | Total: (43) plus (44) | 4,543,100 | |
| 46. | Total plan contributions, five years ended March 31, 1993 | 37,473,446 | |
| 47. | The employer's obligated contributions, five-year period ended March 31, 1993 | _18,993.40_ | |
| 48. | Allocation ratio: (45) divided by (46) | .121235 | |
| 49. | Withdrawal liability component: (47) times (48) | | _2,302.06_ |

✻ SEGAL

B-4

**Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund**

| ITEMS | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|
| **From Year-end March 31, 1994** | | |
| 50. Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 5,387,700 | |
| 51. Reallocated liability, unamortized balance at March 31, 2006 | 251,600 | |
| 52. Total: (50) plus (51) | 5,639,300 | |
| 53. Total plan contributions, five years ended March 31, 1994 | 34,937,396 | |
| 54. The employer's obligated contributions, five-year period ended March 31, 1994 | *19,155.00* | |
| 55. Allocation ratio: (52) divided by (53) | .161412 | |
| 56. Withdrawal liability component: (54) times (55) | | *3,091.85* |
| **From Year-end March 31, 1995** | | |
| 57. Change in unfunded vested liability, unamortized balance at March 31, 2006 | ($ 3,252,200) | |
| 58. Reallocated liability, unamortized balance at March 31, 2006 | 340,500 | |
| 59. Total: (57) plus (58) | (2,911,700) | |
| 60. Total plan contributions, five years ended March 31, 1995 | 31,969,102 | |
| 61. The employer's obligated contributions, five-year period ended March 31, 1995 | *19,731.60* | |
| 62. Allocation ratio: (59) divided by (60) | (.091079) | |
| 63. Withdrawal liability component: (61) times (62) | | *(1,797.13)* |

✻ SEGAL

B-5

**Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund**

| ITEMS | | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|---|
| **From Year-end March 31, 1996** | | | |
| 64. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | ($ 1,939,200) | |
| 65. | Reallocated liability, unamortized balance at March 31, 2006 | 855,400 | |
| 66. | Total: (64) plus (65) | (1,083,800) | |
| 67. | Total plan contributions, five years ended March 31, 1996 | 32,393,712 | |
| 68. | The employer's obligated contributions, five-year period ended March 31, 1996 | 20,772.60 | |
| 69. | Allocation ratio: (66) divided by (67) | (.033457) | |
| 70. | Withdrawal liability component: (68) times (69) | | ( 694.96 ) |
| **From Year-end March 31, 1997** | | | |
| 71. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | ($ 1,570,000) | |
| 72. | Reallocated liability, unamortized balance at March 31, 2006 | 280,100 | |
| 73. | Total: (71) plus (72) | (1,289,900) | |
| 74. | Total plan contributions, five years ended March 31, 1997 | 32,852,977 | |
| 75. | The employer's obligated contributions, five-year period ended March 31, 1997 | 22,352.40 | |
| 76. | Allocation ratio: (73) divided by (74) | (.039263) | |
| 77. | Withdrawal liability component: (75) times (76) | | ( 877.62 ) |

✳ SEGAL

**Chicago Truck Drivers, Helpers and Warehouse
Workers Union (Independent) Pension Fund**

| ITEMS | | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|---|
| **From Year-end March 31, 1998** | | | |
| 78. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | ($ 8,464,000) | |
| 79. | Reallocated liability, unamortized balance at March 31, 2006 | 532,200 | |
| 80. | Total: (78) plus (79) | (7,931,800) | |
| 81. | Total plan contributions, five years ended March 31, 1998 | 34,532,040 | |
| 82. | The employer's obligated contributions, five-year period ended March 31, 1998 | _24,064.00_ | |
| 83. | Allocation ratio: (80) divided by (81) | (.229694) | |
| 84. | Withdrawal liability component: (82) times (83) | | _(5,165.17)_ |
| **From Year-end March 31, 1999** | | | |
| 85. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 3,929,300 | |
| 86. | Reallocated liability, unamortized balance at March 31, 2006 | 158,700 | |
| 87. | Total: (85) plus (86) | 4,088,000 | |
| 88. | Total plan contributions, five years ended March 31, 1999 | 33,531,818 | |
| 89. | The employer's obligated contributions, five-year period ended March 31, 1999 | _27,497.60_ | |
| 90. | Allocation ratio: (87) divided by (88) | .121914 | |
| 91. | Withdrawal liability component: (89) times (90) | | _3,352.34_ |

☆ SEGAL

B-7

**Chicago Truck Drivers, Helpers and Warehouse
Workers Union (Independent) Pension Fund**

| | ITEMS | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|---|
| | **From Year-end March 31, 2000** | | |
| 92. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 1,937,700 | |
| 93. | Reallocated liability, unamortized balance at March 31, 2006 | 148,300 | |
| 94. | Total: (92) plus (93) | 2,086,000 | |
| 95. | Total plan contributions, five years ended March 31, 2000 | 36,995,455 | |
| 96. | The employer's obligated contributions, five-year period ended March 31, 2000 | *30,389.20* | |
| 97. | Allocation ratio: (94) divided by (95) | .056385 | |
| 98. | Withdrawal liability component: (96) times (97) | | *1,713.50* |
| | **From Year-end March 31, 2001** | | |
| 99. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 5,970,500 | |
| 100. | Reallocated liability, unamortized balance at March 31, 2006 | 481,500 | |
| 101. | Total: (99) plus (100) | 6,452,000 | |
| 102. | Total plan contributions, five years ended March 31, 2001 | 38,452,244 | |
| 103. | The employer's obligated contributions, five-year period ended March 31, 2001 | *33,301.20* | |
| 104. | Allocation ratio: (101) divided by (102) | .167793 | |
| 105. | Withdrawal liability component: (103) times (104) | | *5,587.71* |

✳ SEGAL

B-8

**Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund**

| ITEMS | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|
| **From Year-end March 31, 2002** | | |
| 106. Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 6,870,000 | |
| 107. Reallocated liability, unamortized balance at March 31, 2006 | 328,500 | |
| 108. Total: (106) plus (107) | 7,198,500 | |
| 109. Total plan contributions, five years ended March 31, 2002 | 39,885,947 | |
| 110. The employer's obligated contributions, five-year period ended March 31, 2002 | *36,296.40* | *650,047* |
| 111. Allocation ratio: (108) divided by (109) | .180477 | |
| 112. Withdrawal liability component: (110) times (111) | | |
| **From Year-end March 31, 2003** | | |
| 113. Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 33,228,500 | |
| 114. Reallocated liability, unamortized balance at March 31, 2006 | 86,600 | |
| 115. Total: (113) plus (114) | 33,315,100 | |
| 116. Total plan contributions, five years ended March 31, 2003 | 30,020,690 | |
| 117. The employer's obligated contributions, five-year period ended March 31, 2003 | *39,010.80* | *43,291.77* |
| 118. Allocation ratio: (115) divided by (116) | 1.109738 | |
| 119. Withdrawal liability component: (117) times (118) | | |

✳ SEGAL

B-9

**Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund**

| ITEMS | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|
| **From Year-end March 31, 2004** | | |
| 120. Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 50,554,200 | |
| 121. Reallocated liability, unamortized balance at March 31, 2006 | 347,900 | |
| 122. Total: (120) plus (121) | 50,902,100 | |
| 123. Total plan contributions, five years ended March 31, 2004 | 29,592,158 | |
| 124. The employer's obligated contributions, five-year period ended March 31, 2004 | *41,654.80* | |
| 125. Allocation ratio: (122) divided by (123) | 1.720121 | |
| 126. Withdrawal liability component: (124) times (125) | | *71,651.30* |
| **From Year-end March 31, 2005** | | |
| 127. Change in unfunded vested liability, unamortized balance at March 31, 2006 | $ 12,146,400 | |
| 128. Reallocated liability, unamortized balance at March 31, 2006 | 523,500 | |
| 129. Total: (127) plus (128) | 12,669,900 | |
| 130. Total plan contributions, five years ended March 31, 2005 | 28,258,962 | |
| 131. The employer's obligated contributions, five-year period ended March 31, 2005 | *44,480.80* | |
| 132. Allocation ratio: (129) divided by (130) | .448350 | |
| 133. Withdrawal liability component: (131) times (132) | | *19,942.97* |

B-10

✳SEGAL

**Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund**

**From Year-end March 31, 2006**

| | ITEMS | AMOUNTS | LIABILITY COMPONENTS |
|---|---|---|---|
| 134. | Change in unfunded vested liability, unamortized balance at March 31, 2006 | ($ 2,119,100) | |
| 135. | Reallocated liability, unamortized balance at March 31, 2006 | 292,400 | |
| 136. | Total: (134) plus (135) | (1,826,700) | |
| 137. | Total plan contributions, five years ended March 31, 2006 | 27,310,650 | |
| 138. | The employer's obligated contributions, five-year period ended March 31, 2006 | *47,646.40* | |
| 139. | Allocation ratio: (136) divided by (137) | (.066886) | |
| 140. | Withdrawal liability component: (138) times (139) | | *(3,186.88 )* |
| 141. | Total gross liability – add all items in the last column (subtracting any minuses) | | *49,821.75* |
| 142. | Excess, if any, of gross liability over $100,000 (if no excess, enter zero) | | *49,821.75* |
| 143. | Deductible: (($50,000) minus (142), not less than zero | | *178.25* |
| 144. | Net liability: (141) minus (143) (if negative, enter zero) | | *49,643.50* |

⊀ SEGAL

B-11

# EXHIBIT 1B

CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE
WORKERS UNION (INDEPENDENT) PENSION FUND

AMENDED RULES AND REGULATIONS
PERTAINING TO EMPLOYER WITHDRAWAL LIABILITY

Effective April 1, 1990, the Trustees hereby adopt the following Rules and Regulations:

Section 1.   General

(a)  An Employer that completely or partially withdraws from the Plan shall owe and pay withdrawal liability to the Plan, as determined under these Rules and Regulations and the Employee Retirement Income Security Act of 1974, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("ERISA").

(b)  For purposes of these Rules, all corporations, trades or businesses that are under common control, as defined by ERISA and the Internal Revenue Code or in regulations of the Pension Benefit Guaranty Corporation ("PBGC"), are considered a single Employer.  An entity resulting from a change in business form described in Section 4218(1) of ERISA (29 U.S.C. Section 1381 et seq.) is considered to be the original Employer.

Section 2.   Withdrawal Defined.

(a)  A complete withdrawal shall be as defined in Section 4203 of ERISA.

(b)  A partial withdrawal shall be as defined in Section 4205 of ERISA.  The amount of liability for a partial withdrawal and the total amount due in a 12 month period with respect to a partial withdrawal shall be pro rata shares of the amounts determined as if the Employer had withdrawn completely,

calculated in a manner consistent with the applicable provisions of Sections 4206 and 4219 of ERISA.

(c) For purposes of this section, a withdrawal is not considered to occur solely because the Employer temporarily suspends contributions during a labor dispute involving its employees who are participants of this Plan.

(d) Whether a withdrawal occurs upon the sale of an Employer shall be determined consistent with the applicable provisions of ERISA. The Fund shall be provided whatever information or documents it deems necessary to evaluate whether there has been a bona-fide sale of assets to an unrelated party. For this Fund's purposes, "substantially the same number of contribution base units" as used in Section 4204 shall mean 80% of the seller's contribution base units (expressed in terms of man days) as measured for the 24 month period prior to the month of the sale of assets. The purchaser's contribution base units shall be measured for the 24 month period beginning with the first month after the sale. In the event the purchaser fails to contribute at the 80% level, the exemption under Section 4204 shall not apply, the seller's withdrawal liability will be reinstated, and payments will be due in accordance with the payment schedule beginning with the first quarter after the Fund determines the exemption no longer applies.

(e) For this Fund's purposes, "substantially all" as used in Section 4203(d)(2) shall mean 85%. Whether an employer is "primarily engaged" in the long and short haul trucking industry,

2

the household goods moving industry, or the public warehousing industry, shall be determined by the principal or chief purpose of the Employer's business.

Section 3. Amount of Liability for Complete Withdrawal.

(a) _General_. The amount of an Employer's liability for a complete withdrawal shall be its initial liability amount, reduced in accordance with subsection (h). The amount shall be determined as of the end of the Plan Year preceding the date of the Employer's withdrawal.

(b) _Initial Liability Amounts_. The initial liability amount

> (I) _"Old" Employer_. In the case of an Employer that was obligated to contribute for any part of the Plan Year ended March 31, 1980, and for any part of the period from September 26, 1980 through March 31, 1981, the sum of
>
> > (A) its proportional share of the balance of the Plan's unfunded vested liability as of March 31, 1980, plus
> >
> > (B) the sum of its proportional share of the balances of the changes in the Plan's unfunded vested liability and of the reallocated liability amounts for each Plan Year that ended after March 31, 1980, and before the date of the Employer's withdrawal.

3

(II) *"New" Employer*. In the case of any other
Employer, the sum of its proportional shares of the
changes in the Plan's unfunded vested liability and of
the reallocated amounts for each Plan Year that ended
after March 31, 1980, and before the date of the
Employer's withdrawal.

(c) <u>Unfunded Vested Liability Defined</u>.

(I) For purposes of this Article, the term "vested
benefit" means a benefit for which a participant has
satisfied the conditions for entitlement under this
Plan whether or not the benefit may subsequently be
reduced or suspended by a plan amendment, an occurrence
of any condition or operation of law and whether or not
the benefit is considered "vested" or "nonforfeitable"
for any other purpose under the Plan.

(II) The Plan's liability for vested benefits as of a
particular date is the actuarial present value of the
vested benefits under the Plan as of that date.
Actuarial present value shall be determined on the
basis of methods and assumptions approved by the
Trustees for purposes of these Rules upon
recommendation of the Plan's enrolled actuary. The
actuarial valuation for a Plan Year ending March 31
will be finalized during the immediately following Plan
Year. The assumptions and methods offered by the
Plan's enrolled actuary are set forth in Exhibit A.

4

(III)   The unfunded vested liability shall be the amount, not less than zero, determined by subtracting the value of the Plan's assets from the Plan's liability for vested benefits. The Plan's assets are to be valued on the basis of rules adopted for this purpose by the Trustees, upon recommendation of the Plan's enrolled actuary.

(d)   The balance of the Plan's unfunded vested liability as of March 31, 1980, is the amount determined as of March 31, 1980, reduced by five percent of such amount for each succeeding complete Plan Year.

(e)   <u>Annual Change in Unfunded Vested Liability</u>.

(I)   The change in the Plan's unfunded vested liability for a Plan Year is the amount (which may be less than zero) determined by subtracting from the unfunded vested liability as of the end of the Plan Year the sum of

(A)   the balance (as of the end of the Plan Year) of the unfunded vested liability as of March 31,1980, plus,

(B)   the sum of the balances (as of the end of the Plan Year) of the changes in the unfunded vested liability for each Plan Year that ended after March 31, 1980, and before the Plan Year for which the change is determined.

5

(II)   The balance of the change in the Plan's unfunded vested liability for a Plan Year is the change in the Plan's unfunded vested liability for that year reduced by 5 percent of such amount for each succeeding complete Plan Year.

(f)   Reallocated Liability Amount.   For each Plan Year ending after March 31, 1980, the reallocated liability amount is

(I)   any amount of unfunded vested liability assigned to a withdrawn employer that the Trustees determined in the Plan Year to be uncollectible for reasons arising out of cases or proceedings under Title XI, United States Code, or similar proceedings,

(II)   any amount of unfunded vested liability that the Trustees determine in the Plan Year will not be assessed, as a result of the limitations on liability described in Sections 4209, 4219(c)(1)(B), or 4225 of ERISA, against an employer to whom a notice of liability under Section 4219 has been sent, and

(III)   any amount that the Trustees determined to be uncollectible or unassessable in the Plan Year for other reasons not inconsistent with regulations prescribed by the PBGC.

The balance of the reallocated liability amount for a Plan Year is the reallocated liability amount for that year reduced by five percent of such amount for each succeeding complete Plan Year.

6

(g) <u>Apportionment of Unfunded Liability
to An Employer That Has Withdrawn</u>.

(I) <u>"Old" Liability</u>. An Employer's proportional share of the balance of the Plan's unfunded vested liability as of March 31, 1980, shall be determined by multiplying the balance of the Plan's unfunded vested liability as of that date by a fraction

(A) the numerator of which is the total contributions that the Employer was obligated to make to the Plan for the period January 1, 1975, through March 31, 1980, and

(B) the denominator of which is the total of Employer contributions reported in the audited financial statements of the Plan for the period January 1, 1975, through March 31, 1980, less any contributions otherwise included in that total made by any Significant Employer that was not obligated to contribute to the Plan in the period from September 26, 1980, to March 31, 1981, or had withdrawn from the Plan before September 26, 1980.

(II) <u>Liability Changes and Reallocated Liabilities</u>. An Employer's proportional share of the change in the unfunded vested liabilities and of the reallocated liability amount for a Plan Year ending after March 31, 1980, shall be determined by multiplying each of those amounts, if any, as determined for a Plan Year by a fraction

7

(A)  the numerator of which is the total contribution that the Employer was obligated to make to the Plan for the Plan Year in which the change or reallocation arose and the four preceding Plan Years ("Apportionment Base Period"), and

(B)  the denominator of which is the Total Adjusted Employer Contributions to the Plan with respect to the Apportionment Base Period, determined as follows:

(i)  the total contributions shall be all Employer contributions reported in the audited financial statements of the Plan for those Plan Years, reduced by the amount of any Employer contributions included, consistent with these provisions, in any previous annual total;

(ii)  the Total Adjusted Employer Contributions shall be the total Employer contributions with respect to the Apportionment Base Period, determined under paragraph (i), reduced by any contributions otherwise included in the total that were made by a Significant Employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose and by

8

any other Employer to which a notice of
withdrawal liability was sent by the Plan
within the Apportionment Base Period.

(III)   For purposes of the denominators of the
fractions described in paragraphs (I) and (II),
"Significant Employer" means

(A)   an Employer that contributed, in any one Plan
Year of the relevant period, at least one percent
of total Employer contributions to the Plan for
that year, as determined for purposes of the
relevant denominator or, if lower, $250,000, and

(B)   any other Employer that was a member of an
Employer association if the contribution
obligations of substantially all members of that
group ceased in a single Plan Year and the group's
aggregate contributions to the Plan in any one
Plan Year of the relevant period totalled at least
one percent of total Employer contributions to the
Plan for that year or, if lower, $250,000.

(IV)   Notwithstanding paragraphs (I) and (II), the
numerators of the fractions described in those
paragraphs shall not include contributions that the
Employer was obligated to make

(A)   under a collective bargaining agreement for
which there was a permanent cessation of the

9

Employer's obligation to contribute before
September 26, 1980, or

(B)   for work performed at a facility at which all
covered operations or the Employer's obligation to
contribute permanently ceased before September 26,
1980,

if and to the extent that the Employer demonstrates
that its total contribution obligation included
contributions properly allocable to such a collective
bargaining agreement or such work.

(h)   <u>Limitations on the Amount of Withdrawal Liability</u>.

(I)   <u>Deductible</u>.   From the initial liability amount,
there shall be deducted the lesser of

(A)   $50,000, or

(B)   three-fourths (3/4) of one percent of the
Plan's unfunded vested liability as of the end of
the Plan Year preceding the Employer's withdrawal,
less the excess of the initial amount over $100,000.
The deductible shall not be less than zero.

(II)   The amount of initial liability remaining after
application of paragraph (I) shall be reduced, to the
extent applicable, in accordance with Section
4219(c)(1)(B) of ERISA.

(III)   The amount of initial liability remaining after
application of paragraph (II) shall be reduced in
accordance with Section 4225 of ERISA, if and to the

10

extent that the Employer demonstrates that additional limitations under that section apply.

Section 4.   Satisfaction of Withdrawal Liability.

(a)   Withdrawal liability shall be payable in installments, in accordance with Section 5.   The total amount due in each 12 month period beginning on the date of the first installment shall be the product of

(I)   the highest rate at which the Employer was obligated to contribute to the Plan in the period of ten consecutive Plan Years, ending with the Plan Year in which the withdrawal occurred, multiplied by

(II)   the Employer's average annual contribution base for the three consecutive Plan Years, within the ten consecutive Plan Years ending before the Year in which the withdrawal occurred, during which the Employer's contribution base was the highest,

except that the number of installment payments due in the final year shall be reduced to assure that the total payments will not exceed the Employer's total amortized withdrawal liability.

(b)   If, in connection with the Employer's withdrawal, the Plan transfers benefit liabilities to another plan to which the Employer will contribute, the Employer's withdrawal liability shall be reduced in an amount equal to the value of the unfunded vested benefits that are transferred, determined as of the end of the Plan Year preceding the withdrawal on the same basis as the

11

determination of the Plan's unfunded vested liability under Section 3.

Section 5. Notice and Collection of Withdrawal Liability.

(a) General. Notice of withdrawal liability, reconsideration, determination of the amortization period and of the maximum years of payment shall be as provided in Section 4219 of ERISA and in this section.

(b) The Obligations of a Controlled Group. In the event the withdrawn Employer/member of the controlled group is under the jurisdiction of a bankruptcy court, the other members of the controlled group are obligated to initiate the review and arbitration procedures set forth in this Section notwithstanding any claim the Fund may have filed in the bankruptcy court.

(c) Resolution of Disputes. Any dispute concerning whether a complete or partial withdrawal has occurred, concerning the amount and/or payment of any withdrawal liability, or any other matter pertaining to ERISA Sections 4201 through 4219 and ERISA Section 4225 will be resolved in the following manner:

> (I) Review By The Fund. If, within ninety (90) days after an Employer receives a notice and demand for payment of withdrawal liability from the Fund, the Employer in writing to the Fund (i) requests a review of any specific matter relating to the determination of such liability and the schedule of payments, (ii) identifies any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the

12

Employer, or (iii) furnishes any additional relevant information to the Fund, a review will be conducted by the Board of Trustees.

The request for review must explicitly state any alleged inaccuracies or areas of dispute. Any information submitted must be supported by affidavit of the Employer or its legal representative. The following information, where applicable, must be supplied as part of the request for review:

- Identification of any controlled group of which the Employer is or was a member. If any member of the controlled group has participated in the Plan at any time since January 31, 1975, identify those members and the "Company number assigned by the Plan";

- Provide a complete copy of the Employer's most recent Annual Report and Securities and Exchange Commission's Form 10-K (with all attachments) for each such member of the controlled group. If the employer is not subject to SEC jurisdiction, supply a copy of the most closely comparable State filing, financial statement, or similar document;

- Contribution/employment history records, schedules, exhibits, financial statements, etc., supporting Employer's position;

13

- Articles of Incorporation or other notarized corporate filings evidencing a corporate name change;

- Copies of any and all agreements, complete with exhibits and signature pages, evidencing a sale of assets, corporate reorganization, merger or stock purchase;

- Copies of any Strike Settlement Agreement or Notices or Orders from the National Labor Relations Board pertaining to decertification of the Union or bargaining out of the Fund;

- Any other information the Employer maintains would support its request for review.

The review and <u>all</u> subsequent procedures in that regard will be limited to the materials offered by the Employer in this request, and no claims, objections, or defenses will be considered if they are not presented at this time. The Trustees will respond in writing to the request for review.

Should the Employer fail to make a timely-request for review, the Board of Trustees will consider that Employer to have fully accepted the withdrawal liability assessment.

(II) <u>Arbitration</u>. Within 60 days following the earlier of receipt of a written decision from the Trustees in accordance with subparagraph (a) above or

14

120 days after an Employer has made a timely written request for a review of such withdrawal liability matters specified above, either the Employer or the Fund may initiate an arbitration proceeding as provided herein.

(A) <u>Manner of Initiation</u>. Arbitration is initiated by written notice to the Chicago Regional Office of the American Arbitration Association ("AAA") with copies to the Fund (or if initiated by the Fund to the Employer). The arbitration will be conducted, except as otherwise provided in these rules, in accordance with the "Multiemployer Pension Plan Arbitration Rules") (the "AAA Rules") administered by the AAA. The initial filing fee is to be paid by the party initiating the arbitration proceeding. Arbitration is timely initiated if received by the AAA along with the initial filing fee within the time period prescribed by ERISA Section 4221(a)(1) and PBGC regulation Part 2641.2.

<u>Venue</u>. All arbitrations shall be conducted in Chicago, Illinois. All litigation involving withdrawal liability shall be in the United States District Court for the Northern District of Illinois.

15

<u>Board of Arbitration</u>. All arbitrations shall be conducted by a tri-partite board of arbitration. Each party shall appoint an arbitrator and the two arbitrators so selected shall select the neutral member of the board. Any decision of the board shall be by majority vote.

(d) <u>Schedule of Payment</u>.

(I) Withdrawal liability shall be paid in equal quarterly installments:

(A) over the period of years required to amortize the amount in level annual payments;

(B) calculated as if the first payment was made on the first day of the plan year following the plan year in which the withdrawal occurs and as if each subsequent payment was made on the first day of each subsequent plan year. Such amortization period shall be determined based on actuarial assumptions used in the most recent actuarial valuation of the Plan;

(C) notwithstanding the pendency of any review, arbitration or other proceedings, payment shall begin on the first day of the month that begins at least ten days after the date notice of, and demand for, payment is sent to the Employer;

(D) if the amortization period described in (a) above exceeds 20 years, the liability of the

16

Employer shall be limited to the first 20 annual payments.

(II)  If, following review, arbitration or other proceedings, the amount of the Employer's withdrawal liability is determined to be different from the amount set forth in the notice and demand, adjustment shall be made by reducing or increasing the total number of installment payments due.  If the Employer has paid more than the amount finally determined to be its withdrawal liability, the Plan shall refund the excess with interest at the rate used to determine the amortization period for the withdrawal liability payments.

(III)(A)  In the event of a withdrawal of all or substantially all Employers which contribute to the Plan (as described in Section 4219(c)(1)(D) of ERISA) above shall not apply, and the total unfunded vested benefits shall be allocated among all such Employers according to regulations established by the Pension Benefit Guaranty Corporation (the "PBGC").

(B)  As described in Section 4219(c)(1)(E) of ERISA, the amount of annual payment shall be adjusted in the event of a partial withdrawal.

(C)  An Employer shall be entitled to prepay his

17

withdrawal liability and accrued interest without penalty.

(IV) (A)  Non-payment by an Employer of any amounts due shall not relieve any other Employer from its obligation to make payment.

(B)  In addition to any other remedies to which the Fund may be entitled, an Employer shall be obligated to pay interest on the amounts due to the Fund from the date when the payment was due to the date when the payment is made.  The interest payable by an Employer shall be computed and charged to the Employer at the prime interest rate as reported daily by the Wall Street Journal for the fifteenth (15th) day of the month for which the interest is charged.  Any judgment against an Employer for contributions or withdrawal liability payments owed to this Fund or to enforce an arbitrator's award shall include by mandate of the court the greater of (a) double the interest computed and charged in accordance with this section or (b) liquidated damages based on the unpaid contributions or withdrawal liability payments only (exclusive of interest) in the amount of 20% in accordance with ERISA Section 502(g)(2)(C), as amended by the 1980 Act. Attorney's fees and costs shall be awarded in

18

accordance with Section 502(g)(2)(D). Nothing in this paragraph shall be construed as a waiver of the Plan's right to any other legal or equitable relief.

(C) The rate of interest on overdue, defaulted and overpaid withdrawal liability shall be the prime rate as reported daily by the Wall Street Journal for the fifteenth (15th) day of the month for which the interest is charged.

(e) <u>Default</u>. In the event of a default, the outstanding amount of the withdrawal liability shall immediately become due and payable. A default occurs if:

(I) the Employer fails to make, when due, any payments of withdrawal liability, if such failure is not cured within 60 days after such Employer receives written notification, at the last known address of the Employer, of such failure; or

(II) the Trustees deem the Fund insecure as a result of any of the following events with respect to the Employer:

(A) the Employer's insolvency, or any assignment by the Employer for the benefit of creditors, or the Employer's calling of a meeting of creditors, or the Employer's appointment of a committee of creditors or liquidating agent, or

19

(B)   the Employer's failure or inability to pay its debts as they become due;

(C)   the commencement of any proceedings by or against the Employer (with or without the Employer's consent) pursuant to any bankruptcy or insolvency laws or any laws relating to the relief of debtors, or the readjustment, composition or extension of indebtedness, or to the liquidation, receivership, dissolution, or reorganization of debtors;

(D)   any other event or circumstance which in the judgment of the Trustees materially impairs the Employer's creditworthiness or the Employer's ability to pay its withdrawal liability when due.

(f)   <u>Other Terms and Conditions</u>.   The Trustees may require that an Employer post a bond or provide the Plan other security for payment of its withdrawal liability if

(I)   the Employer's payment schedule would extend for longer than 18 months,

(II)   the Employer is the subject of a petition under the Bankruptcy Code or similar proceedings under state or federal law, or

(III)   substantially all of the Employer's assets are sold, distributed or transferred out of the jurisdiction of the courts of the United States.

20

<u>Section 6</u>.  <u>Liability Adjustments and Abatement</u>.

(a)  <u>Abatement of Withdrawal Liability</u>.  The liability of an Employer for a withdrawal shall be reduced or abated in accordance with Sections 4207 and 4206 of ERISA and PBGC regulation Part 2647 and proposed Part 2646.

(b)  To the extent not inconsistent with PBGC regulations, in the event an Employer seeks in writing to reparticipate in the Fund:

(I)  the Employer must make all required withdrawal liability payments through the "reentry date," plus delinquent interest, if any;

(II)  the Employer must execute a new Collective Bargaining Agreement requiring contributions to the Fund and resume covered operations;

(III)  the Employer's contribution base units (with respect to the covered operations) during the "measurement period" must satisfy the test set forth in PBGC regulations;

(IV)  the Employer must either:

(A)  Continue making its required withdrawal liability payments during the pendency of an abatement determination; or

(B)  Post a bond or escrow in accordance with the terms of PBGC regulations.

(V)  the Fund will <u>not</u> return any withdrawal liability payments made by the Employer.  If the Employer

21

satisfies the requirements stated above, such
withdrawal liability payments shall be applied as a
credit against future assessments of withdrawal
liability against the Employer.

(VI)  For purposes of the above, the term "reentry
date" shall mean the later of (i) the date on which the
Fund receives a properly executed Collective Bargaining
Agreement which conforms to all applicable rules of the
Fund, or (ii) the date on which contributions to the
Fund are to resume pursuant to such Collective
Bargaining Agreement.

(VII)  These provisions shall be subject to any PBGC
regulation governing reparticipation.

(c)  Successive Withdrawals.  If, after a withdrawal, an
Employer again incurs liability for a complete or partial
withdrawal, the liability incurred as a result of the later
withdrawal(s) shall be adjusted in accordance with PBGC
regulations Part 2647 and proposed Part 2646.

Section 7.  Mass Withdrawal.

Notwithstanding any other provision of these Rules, if all
or substantially all contributing Employers withdraw from the
Plan pursuant to an agreement or arrangement, as determined under
ERISA Section 4209 and 4219(c)(1)(D), the withdrawal liability of
each such Employer shall be adjusted in accordance with those
ERISA sections.

22

Section 8.   Notice to Employers.

(a)  Any notice that must be given to an Employer under these Rules or under Subtitle E of Title IV of ERISA shall be effective if given to the specific member of a commonly controlled group that has or has had the obligation to contribute under the Plan.  The Employer shall be required to notify the Fund in writing of any change in address.  The Fund shall send any notice or demand to the Employer's last known address.

(b)  Notice shall also be given to any other members of the controlled group that the Employer identifies and designates to receive notices hereunder, in accordance with a procedure adopted by the Trustees.

These Rules and Regulations shall be effective April 1, 1990.  These Rules and Regulations may be signed in counterparts and the Trustees waive any requirement that a Trustees' meeting be held.

Date: _____ 4/3/90 _____          Date: _____ 4/3/90 _____

Date: _____ 4/3/90 _____          Date: _____ 4/3/90 _____

23

# EXHIBIT 1C

CHGO TRUCK DRIVERS, HELPERS and WAREHOUSE WORKERS UNION (Independent)
Calculation of Interest on Delinquent Withdrawal Liability Payments
FUND OWED: PENSION FUND

Employer Name:  Loyal Casket Company
Date(s) Payments were Due:  See Below          Date of Calculation:  11/30/06

| Amount Owed | Due Date | Sub-Total For Interest Calc | Interest Period | Int Rate | Date* Effec | Days Delinq | Interest Per Day | INTEREST OWED |
|---|---|---|---|---|---|---|---|---|
| $149,643.50 | 7/1/06 | $149,643.50 | 7/1/06-7/14/06 | 8.00% | 5/10/06 | 14 | $32.80 | $ 459.20 |
| " | | " | 7/15/06-12/12/06 | 8.25% | 6/29/06 | 151 | 33.82 | 5106.82 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | Interest due thru 12/12/06 | | $5,566.02 |

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT) PENSION FUND, and JACK STEWART, trustee, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 06 C 5987 |
| v. | ) ) ) | Judge Filip Magistrate Judge Brown |
| LOYAL CASKET COMPANY, an Illinois corporation, | ) ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF WILLIAM W. LEATHEM

I, William W. Leathem, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct.

1.    I am a lawyer with the Chicago, Illinois law firm of Jacobs, Burns, Orlove, Stanton & Hernandez ("Jacobs Burns"), and have been with the firm since June 1998. I represent Plaintiffs in this matter. I have personal knowledge of the facts set forth in this declaration and am competent to testify if necessary.

2.    I received my Juris Doctorate degree from the John Marshall Law School in 1989. I was admitted to the Illinois bar in 1989, and have practiced law continuously since that time. I am also admitted to practice before: the Supreme Court of the United States; the United States Court of Appeals for the Sixth Circuit, the Seventh Circuit, and the Eighth Circuit; and the United States District Court for the Northern District of Illinois, the Central District of Illinois, the Western District of Michigan, the Eastern District of Michigan, and the Eastern District of Wisconsin. Additionally, I am a member of the Trial Bar of the United States District Court for

the Northern District of Illinois, and the Trial Lawyers Association of America.

3.   From 1989 through 1997, I was a staff attorney with the Central States, Southeast and Southwest Areas Pension and Health and Welfare Funds. There I worked in the Special Litigation section where I handled complex litigation involving the Funds and their Trustees, various ERISA fund matters, and non-routine employee benefit, delinquent contribution, and withdrawal liability issues.

4.   From November 1997 through May 1998 I worked as Senior Counsel for the Sheet Metal Workers' National Pension Fund in Alexandria, Virginia, where I concentrated on fiduciary breach and insurance-related litigation, as well as some employee benefit issues.

5.   The majority of my work at Jacobs Burns involves representing funds and their trustees in ERISA actions before the United States District Courts, Bankruptcy Courts, and Courts of Appeals. I also represent various municipal funds in State Courts. Additionally, I have litigated FLSA cases, Title VII cases, and union representation cases, and defended respondents before the Illinois Human Rights Commission.

6.   I have served as lead or second-chair counsel on a number of trials in Federal and State courts, and estimate that I have drafted and/or argued twenty cases before the United States Supreme Court, Courts of Appeals, and State Appellate Courts.

7.   In 2005, I represented four plaintiffs in an FLSA case before Judge Lindberg, *Sanjuarnero et al. v. Spark Auto,* Case No. 05 C 619 (N.D.Ill.). In that case, the employer agreed to pay my attorneys' fees at the rate of $325 per hour. Also in 2005, I was approved for attorneys' fees by Judge Black at the rate of $275 per hour in a bankruptcy case, *In re M&M Roofing, Inc.,* Case No. 04 B 3701 (Bankr.N.D.Ill.). In 2003, I defended an employer in an FLSA matter before Judge Hart, *Nunez et al. v. Pizza Nova, Inc., et al.,* Case No. 03 C 5928

(N.D.Ill.). The hourly rate that I billed and was paid for this client was $350 per hour. In 2001, Judge Shadur awarded me attorneys' fees at the rate of $225 per hour for representing ERISA trustees in a delinquent contribution action, *Moriarty v. Hills Funeral Home, Ltd., et al.,* Case No. 98 C 773 (N.D.Ill.), though the award was subsequently vacated by defendant's successful appeal. At about the same time, I defended an employer in a case before Judge Coar, *Peal v. Zacks Investment Research, Inc.,* Case No. 00 C 7814 (N.D.Ill.), for alleged Title VII violations, in which my time was billed to the client at $240 per hour. In another case before Judge Coar, *Chicago Truck Drivers et al. v. El Paso CGP Company, et al.,* Case No. 04 C 7872 (N.D.Ill.), *appeal pending,* the defendants agreed to pay my attorney's fees at the rate of $295 per hour.

8.  Jacobs Burns and its predecessors have been in existence since 1930. From its inception, the firm has dedicated itself virtually exclusively to the representation of labor unions, their members, and multiemployer employee benefit funds. Consistent with its dedication to the labor movement, Jacobs Burns charges these clients a rate that is less than could be secured by lawyers in the Chicago metropolitan region.

9.  In light of my experience, the prevailing market rate for Jacobs Burns attorneys prosecuting ERISA collection actions, *see e.g. Moriarty v. B. Michael Muzyka, Ltd., et al.,* Case No. 03 C 7946 (N.D.Ill.), the results obtained in this case to date, and cases such as *People Who Care v. Rockford Board of Education,* 90 F.3d 1307, 1310, 1312 (7th Cir.1996) and *Central States Pension Fund v. Central Transport, Inc.,* 76 F.3d 114, 116-117 (7th Cir.1996) which advocate the market rate for attorneys who commit themselves to represent the not-so-privileged, I believe that a reasonable market rate for my work in this case is $295.00 per hour.

10.  I have reviewed my firm's billing records on this matter and have determined that I performed the following work in connection with this case and motion: initial investigation

3

concerning the employer's corporate status; reviewing the withdrawal liability assessment; general matters concerning the pleadings, including drafting and finalizing the complaint in this case; telephone conversations with and drafting correspondence to the Fund; calculating and reviewing the amounts owed to the Fund; drafting and finalizing the motion for default, the notice, the judgment order, my declaration, and assisting Phyllis Gabriel in preparing her declaration; and organizing exhibits for the default motion.

11.     A reasonable and customary billing rate for the services I performed on this motion is $295.00 per hour.  At this rate, my attorney's fees total $2,566.50 (8.7 hours @ $295.00).

12.     Plaintiff also incurred costs totaling $420.00 in connection with this matter: (a) $350.00 - filing fee; (b) $70.00 - service of process fee.

13.     The above fees and costs all were necessary and are reasonable in amount.

Executed on December 4, 2006.

/s/  William W. Leathem
William W. Leathem

4